UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

Kenneth STANLEY,

                              Petitioner,

              -against-

Joseph T. SMITH,

                              Respondent.

-------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE ANALISA TORRES:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 8/9/2013

12-CV-06362 (AT)(SN)

REPORT AND
RECOMMENDATION

        After a jury trial, *pro se* petitioner Kenneth Stanley was convicted of two counts of
Robbery in the First Degree, N.Y. Penal Law (the "Penal Law") §§ 160.15(2) and (4), one count
of Robbery in the Second Degree, Penal Law § 160.10(1), and two counts of Criminal
Possession of a Weapon in the Second Degree, Penal Law §§ 265.03(1)(b), and (3). Stanley was
sentenced, as a second violent felony offender, to determinate 17-year prison terms on the
Robbery in the First Degree counts, and to determinate 15-year prison terms on the Robbery in
the Second Degree and Criminal Possession of a Weapon in the Second Degree counts. These
sentences run concurrently and will be followed by five years of post-release supervision. His
conviction was unanimously affirmed by the Appellate Division of the New York Supreme
Court, First Department (the "Appellate Division"). The New York Court of Appeals denied
leave to appeal.

        Stanley filed this *pro se* petition for a writ of *habeas corpus*, pursuant to 28 U.S.C. §
2254, alleging that he is being held in state custody in violation of his federal constitutional
rights. Stanley asserts that a writ of *habeas corpus* should be issued for two reasons. First, he

argues that the admission of his lineup identification at trial violated his rights because the lineup identification was the fruit of an unlawful arrest and unduly suggestive. Second, Stanley argues his sentence was excessive. For reasons explained below, Stanley's petition for a writ of *habeas corpus* should be DENIED.

## BACKGROUND

The following facts are taken from the records of Stanley's suppression hearing and trial.

I.      **Factual Background**

On August 18, 2007, at about 12:30 a.m., Tarik Bailey and Kenneth McCoy parked Bailey's white Range Rover at a parking lot between Fifth and Sixth Avenues with entrances on 21st and 22nd Streets, next door to their nightclub destination. McCoy was wearing a white gold chain with a medallion around his neck and a sterling silver watch.

At about 4:30 a.m., Bailey, McCoy, and their friend "Mel" left the club and walked to the parking lot. As they approached Bailey's car, Bailey and McCoy saw three men enter the lot from 22nd Street. Bailey went ahead to pull out his car. The three men then approached McCoy. One took out a silver automatic firearm, fired at McCoy's feet, and demanded and then took McCoy's medallion and chain, while another took McCoy's wristwatch.

After hearing the gunshot, Bailey looked over from his car and saw a man pointing a gun down at the ground near McCoy. Bailey started his vehicle, shifted into reverse, backed up into a light pole so that it fell over, shifted into drive and drove toward McCoy and the three men. The three men then ran out of the parking lot and turned toward Fifth Avenue.

The three men were later identified as Stanley, Shaunda Jones, and Allen Stewart. At the time, Stanley, who took the wristwatch, was wearing a white T-shirt, blue jeans, and a red baseball cap, Jones, who fired the gun, was wearing a white T-shirt, jean shorts, and a blue do-

rag, and Stewart, who had braided hair, was wearing a white T-shirt with a gold emblem on it and blue jeans.

Meanwhile, uniformed Sergeant Michael O'Sullivan was on foot patrol at the corner of Fifth Avenue and 21st Street. At about 4:30 a.m., Sergeant O'Sullivan heard a crashing or booming sound coming from the direction of 21st Street, between Fifth and Sixth Avenues. He then saw three black men in light-colored shirts running southbound together down the middle of Fifth Avenue. At the intersection of 21st Street, he saw one of the men attempt to enter a dark-colored minivan, which sped off without him. A taxi passenger called out to Sergeant O'Sullivan that something was going on around the corner and pointed north toward the intersection of Fifth Avenue and 22nd Street. Sergeant O'Sullivan then pursued the men.

At the same time, Lieutenant Nicholas McAteer, who was in plainclothes, had just finished investigating a nearby stabbing. He heard two loud noises, but could not determine their origin. He then went to the corner of 21st Street and Fifth Avenue, where he saw three individuals in white t-shirts running south on Fifth Avenue: a tall black man, a tall black man with a blue do-rag, and a shorter black man. Behind the three men, he saw Sergeant O'Sullivan in pursuit.

Sergeant O'Sullivan approached Lieutenant McAteer, motioning toward Stanley, Jones and Stewart and calling out, "[t]hey possibly either robbed or shot someone." (Hearing Transcript ("H.") at 22-23, 38-41, 74.)[1] Lieutenant McAteer started chasing the three men, who were already about a half block further south on Fifth Avenue. Two members of Lieutenant McAteer's team, Detective Fenfert and Officer Kong, also joined in pursuit – Detective Fenfert

---

[1] At the hearing, Sergeant O'Sullivan clarified that he said those words because they were the two worst case scenarios that he could think of at the time.

on foot and Officer Kong in an unmarked police vehicle. Having provided his information, Sergeant O'Sullivan ceased his chase, and instead went to investigate the surrounding area.

Lieutenant McAteer identified himself as a police officer and repeatedly ordered Stanley, Jones and Stewart to stop. Between 20th and 19th Streets, Lieutenant McAteer observed Jones trail behind the other two men and then grab or fiddle with his waistband. Lieutenant McAteer momentarily lost sight of Stanley, Jones and Stewart as they turned the corner onto 19th Street, but regained sight when he and Detective Fenfert also turned the corner. Stewart had removed his white T-shirt and now wore a black tank top. At this point, Lieutenant McAteer and Detective Fenfert stopped Jones and Stewart by 7 East 19th Street, on the north side of the street, while Officer Kong stopped Stanley (who had separated from the others) on the south side of the street.

Detective John Capers responded to the scene after receiving a radio transmission from Lieutenant McAteer. He observed Stanley, Jones, and Stewart in police custody, noting that Stanley was wearing a white T-shirt and blue jeans, Jones was wearing a white T-shirt, blue jean shorts and a blue do-rag, and Stewart was wearing jeans and a black tank top. Detective Capers then searched: (1) Jones, and recovered two cellular telephones, money, and keys from his pants pocket; (2) Stanley, and recovered a watch, medallion, cash, keys and a cellular telephone from his pants pocket; and (3) Stewart, and recovered a cellular telephone, money, a cigar and keys from his pants pocket. Officer Kong and Detective Fenfert then placed Stanley, Jones, and Stewart in a prisoner van and drove them to the Seventh Precinct.

Next, Lieutenant McAteer and Detective Capers searched the surrounding area. Detective Capers found two white shirts on the sidewalk in front of 7 East 19th Street (but did not pick them up). Lieutenant McAteer found a gun in a pile of garbage along a fence on 19th Street and

Broadway, approximately 20 to 35 feet from where the men were apprehended. After he was called over, Detective Capers recovered the gun.

Lieutenant McAteer and Detective Capers then went to the parking lot and spoke to the garage attendant. The attendant told them that two men in a Range Rover were robbed by three black males, and provided the car's license plate number. Detective Capers returned to the precinct and searched the prison van that had transported the three men, recovering one spent shell casing from behind the front passenger seat.

The police used the license plate number to locate Bailey. By telephone, Bailey told the police where they could locate McCoy. McCoy and Bailey then were brought to the Seventh Precinct, where they spoke with detectives and described the robbery. Detective Capers showed McCoy the watch and gold chain that were recovered from Stanley, and McCoy identified them as his.

That afternoon, the police began conducting lineups. At about 1:20 p.m., McCoy viewed a lineup in which Stewart held the number two spot. McCoy wavered between identifying number two and number three, and finally chose number three after a police officer advised him either that he could not pick two people or that he could pick only one. At about 1:55 p.m., McCoy viewed a lineup with Jones and identified him as the man with the gun in the parking lot. Bailey did not view any lineups at that time.

Four days later, on August 22, 2007, McCoy and Bailey arrived at the District Attorney's Office to view a series of lineups that had been arranged pursuant to a court order. Before the lineups, Detective Capers saw Jones and noticed that he was wearing a blue do-rag like the one he had worn when he was detained. Detective Capers took the do-rag and vouchered it.

5

Bailey first viewed Stewart in a lineup, but did not identify him. Later, Bailey viewed a lineup containing Jones and identified him as the man who had held the firearm. Bailey also viewed a lineup containing Stanley and five other people ("fillers"), all of whom were wearing matching grey sweatshirts and white caps. At the time Stanley was 24 years old, two fillers were 38 years old, two were 37 years old, and one was 31 years old. Bailey did not identify Stanley in the lineup.

Stanley then changed positions from number three to number two for a lineup viewed by McCoy. In that lineup, McCoy identified Stanley as the person who took his property. Detective Capers also interviewed Stanley, but failed to issue a <u>Miranda</u> warning. During that interview, Stanley told Detective Capers that he had been inside of a club when he heard shots fired, was scared, and ran away.

Also in August, 2007, the police examined the retrieved evidence. They found no fingerprints of value on the handgun, the six bullets inside the gun or the spent shell casing. But ballistics tests indicated that the gun and its ammunition were operable, and that the gun had been used to fire the shell casing found in the prisoner van.

The police also collected DNA samples from the gun, the ammunition, and the three suspects. Lucy Eng, a criminalist at the Office of the Chief Medical Examiner, found that the DNA from the gun contained a mixture of at least two people's DNA, although only the DNA profile of the major contributor could be generated. Eng compared that DNA with the three suspects' DNA profiles and determined that Stanley was the major contributor to the DNA sample taken from the gun. DNA testing performed on the gun's magazine was inconclusive.

II.     **The Suppression Hearing**

Stanley moved to suppress the watch, gold chain, his statement to the police at the precinct, the lineup identification, and in-court identification testimony. Stewart moved to suppress identification testimony and physical evidence. Jones moved to suppress identification testimony and his statement to the police. The three men proceeded together to the suppression hearing, which was held before New York County Supreme Court Justice James Yates on June 3, 2008, and June 11, 2008.

At the hearing, the prosecution first presented its case. Stanley and the other two men did not present any evidence. Stanley's counsel argued that there was no probable cause to arrest Stanley and, therefore, the evidentiary fruit of that unlawful arrest should be suppressed. He argued that the police knew little when they arrested Stanley: they heard a loud noise, saw three men running and one try to get into a van, and were told by a taxi passenger that something was happening around the corner. He provided an alternative theory to explain why the men were running down Fifth Avenue, suggesting that Stanley could just have been fooling around with his friends after a night of clubbing. In addition, he argued that the lineup was unduly suggestive by pointing out that Stanley was only 24 years old at the time of the lineup, but four of the five fillers were much older. Finally, he argued that Stanley's statement to Detective Capers should be suppressed because it was obtained without a Miranda warning.[2]

The prosecution argued that the officers had reasonable suspicion to stop Stanley, *inter alia*, after seeing him run and hearing the taxi passenger say that something was going on one block away. Probable cause, the prosecution argued, then was established after the officers recovered the gun and spoke to the garage attendants.

_____

[2] The prosecution conceded that Stanley and Jones were interviewed in custody without a Miranda warning.

7

From the bench, the hearing judge denied Stanley's motion to suppress the lineup as the fruit of an illegal arrest and to suppress identification testimony as the result of an unduly suggestive lineup. The hearing judge did, however, grant Stanley's motion to suppress the statement he made as the product of unlawful custodial interrogation, and also to suppress property recovered from Stanley because the police lacked probable cause to search him. The hearing judge expressly found that the testimony of the three officers was credible, and that the facts were substantially as the officers testified.

On the law, the hearing judge first found that the lineup was not the fruit of an illegal arrest. At the outset, he noted that under the fellow officer rule, each officer involved in the pursuit, detention and search of the defendants could reasonably rely upon the information provided by their fellow officers. There was an evolving and escalating situation, with a combination of factors justifying the officers' pursuit of the three men. The pursuit, consisting of the police chasing the three men and yelling "stop, police," did not constitute a seizure requiring reasonable suspicion but, in any event, the circumstances did give rise to reasonable suspicion based on: Lieutenant McAteer hearing what sounded like a gunshot, given the time and location at which the three men were running; that they were running; that one of them tried to enter a van that sped off; and the statement of the cab passenger that something was happening. Therefore, the pursuit was "entirely justified and reasonable" based on the "combination of factors at that point in time" that established reasonable suspicion. (H. at 461.)

Second, after reviewing a photograph of the lineup, the hearing judge found that the lineup was not unnecessarily or unduly suggestive and that as a matter of due process it was admissible. He specified that, although the lineup was "not perfect," the "law does not call for a perfect line-up." (H. at 457.)

8

Third, he concluded that, because Detective Capers had failed to give Stanley his Miranda warnings, Stanley's statement should be suppressed as violative of his Fifth Amendment rights.

Finally, he found that Detective Capers's search of Stanley on the sidewalk amounted to a full-blown search conducted before the police had obtained probable cause. Although the police were investigating an ongoing situation, they did not yet have sufficient information that a crime had been committed or that Stanley and the other two men had committed it because the search was conducted before the recovery of the gun and before an officer had spoken to the parking lot employee. Thus, the hearing judge granted Stanley's motion to suppress the watch, chain, and cellular telephone.

Following the hearing judge's decision, Stanley proceeded to trial before Supreme Court Justice A. Kirke Bartley, Jr. Jones and Stewart were tried separately.

## III.   The Trial

On September 9, 2008, Stanley's jury trial began. The prosecution first presented its case. Among other evidence: (1) McCoy identified Stanley as one of the robbers; (2) Lieutenant McAteer identified Stanley as one of the men whom he chased and subsequently detained; and (3) Detective Capers identified Stanley as one of the men who had been detained at 19th Street and Broadway. Stanley presented no evidence at trial. The jury found Stanley guilty of two counts of Robbery in the First Degree, one count of Robbery in the Second Degree, and two counts of Criminal Possession of a Weapon in the Second-Degree.

On October 30, 2008, the trial judge sentenced Stanley, as a second violent felony offender, to determinate 17-year prison terms on the Robbery in the First Degree counts, and to determinate 15-year prison terms for the Robbery in the Second Degree and Criminal Possession

of a Weapon in the Second Degree counts. The trial judge directed that all terms were to run concurrently, and were to be followed by five years of post-release supervision.

## IV.    Stanley's Direct Appeal

Stanley filed a counseled brief on direct appeal in the Appellate Division, asserting that: (1) his lineup identification was the fruit of an unlawful arrest; (2) his lineup was unduly suggestive; and (3) his sentence was excessive. The District Attorney filed a brief in opposition. On June 23, 2011, the Appellate Division unanimously affirmed Stanley's conviction. See People v. Stanley, 925 N.Y.S.2d 507 (1st Dep't 2011).

The Appellate Division found that the hearing court properly denied defendant's motion to suppress identification testimony:

> The lineup identification was not the fruit of an unlawful arrest. The hearing evidence establishes that the police had a reasonable suspicion of criminality. This justified their pursuit of [Stanley] and his companions. It appeared that a codefendant discarded a pistol during the pursuit. When police officers recovered the pistol immediately after [Stanley] was detained, the police had probable cause to arrest [Stanley].

Id.  Moreover, "because of intervening events, the lineup identification was attenuated from any initial illegality." Id.

The Appellate Division also found that the "lineup photograph reveal[ed] that the lineup was not unduly suggestive." Id. (citation omitted). "The difference in age between [Stanley] and the fillers was not so noticeable as to single [him] out." Id. (citation omitted). Stanley's skin tone also "was reasonably similar to that of most of the fillers, and . . . [he] did not stand out from the others." Id. As an alternative holding, Stanley's argument premised on differences in skin tones was not preserved for appellate review. Id.

The Appellate Division also "perceive[d] no basis for reducing [Stanley's] sentence." Id.

Stanley sought leave to appeal the Appellate Division's ruling to the New York State Court of Appeals. The prosecution opposed Stanley's application. On August 29, 2011, the Court of Appeals denied leave to appeal. See People v. Stanley, 954 N.E.2d 102 (N.Y. 2011) (table).

Stanley has filed no collateral motions in state court.

## V.        Stanley's Federal *Habeas Corpus* Petition

On August 20, 2012, Stanley filed this *pro se* petition for *habeas corpus* pursuant to 28 U.S.C. § 2254. On October 2, 2012, the Honorable Paul A. Engelmayer referred Stanley's petition to a magistrate judge for a report and recommendation. On October 10, 2012, that referral was reassigned to my docket. On February 15, 2013, respondent filed his response to Stanley's petition. Because Stanley's reply was due on March 18, 2013, but nothing was received, on April 8, 2013, I issued an order extending Stanley's time to reply and warning that his petition would be deemed fully briefed on April 22, 2013. In a letter dated April 19, 2013, Stanley requested an extension of time to reply. On April 30, 2013, I granted Stanley until May 30, 2013, to reply to respondent's opposition. On May 17, 2013, the Honorable Analisa Torres was reassigned as the district judge for this case. On May 21, 2013, I granted Stanley a further extension of time to reply to respondent's opposition. On July 15, 2013, Stanley filed his reply.

## DISCUSSION

Stanley seeks *habeas* relief on the grounds that: (1) his lineup identification was the fruit of an unlawful arrest and unduly suggestive; and (2) his sentence was excessive.

## I.        Timeliness

Stanley's petition was timely filed. A *habeas* petitioner has one year from the date when his conviction becomes final to file his petition for relief. 28 U.S.C. § 2244(d)(1). This one-year period serves the "well-recognized interest in the finality of state court judgments." Duncan v.

<u>Walker</u>, 533 U.S. 167, 179 (2001). A petitioner's judgment becomes final 90 days from the date the New York State Court of Appeals denies leave to appeal – *i.e.*, after the "period to petition for a writ of *certiorari* to the United States Supreme Court." <u>Pratt v. Greiner</u>, 306 F.3d 1190, 1195 & n.1 (2d Cir. 2002). Stanley's conviction became final on November 28, 2011, and his petition was dated August 12, 2012, and docketed on August 20, 2012. Because Stanley's petition was filed within one year of his conviction becoming final, it is timely. Respondent does not contest this issue.

## II.   Statement of Law

Before a petitioner is permitted to seek review from a federal court, he or she first must exhaust all state-provided remedies. 28 U.S.C. § 2254(b)(1)(A); <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 843-44 (1999); <u>Rose v. Lundy</u>, 455 U.S. 509, 515-16 (1982). A claim is deemed exhausted if the petitioner: (1) fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts; and (2) presented his claim to the highest state court which could hear his claim. <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004); <u>O'Sullivan</u>, 526 U.S. at 844-48.

To fairly present his claims, a petitioner may not rely solely on general principles of fairness, and instead must refer to specific constitutional provisions or concepts. <u>Compare</u> <u>France v. LeFevre</u>, 83 Civ. 03829 (CSH), 1985 WL 503, at *2 (S.D.N.Y. Mar. 29, 1985) (finding "mere reference to the right to 'due process' or a 'fair trial' is not alone necessarily sufficient to alert the state courts to the federal nature of a claim") <u>with</u> <u>De La Cruz v. Kelly</u>, 648 F. Supp. 884, 888 (S.D.N.Y. 1986) (finding that petitioner alerted the state court of the constitutional aspect of his claims when he argued that the challenged ruling denied him a fair trial and cited the Fourteenth Amendment). The legal doctrine asserted in the state courts does not need to be

identical to that raised in the *habeas* petition, but the "nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." Daye v. Att'y Gen. of State of N.Y., 696 F.2d 186, 192 (2d Cir. 1982).

The Court of Appeals for the Second Circuit applies the "fair presentation" standard liberally, allowing that a state court may be deemed to be on notice of the constitutional nature of a claim even if the petitioner did not specifically quote the United States Constitution. Notice will be found when the appellate brief shows "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Ramirez v. Att'y Gen. of State of N.Y., 280 F.3d 87, 95 (2d Cir. 2001) (citing Daye, 696 F.2d at 194). This position protects petitioners who rely on constitutional principles without citing "book and verse on the federal constitution" while ensuring that state courts have the opportunity to "pass upon and correct" alleged violations of federal rights. Picard v. Connor, 404 U.S. 270, 275, 278 (1971) (citations omitted).

A *habeas* petitioner must also exhaust his administrative remedies. The exhaustion requirement is rooted in a "policy of federal-state comity," id. at 275, "protect[s] the state courts' role in the enforcement of federal law[,] and prevent[s] disruption of state judicial proceedings," Rose, 455 U.S. at 518 (citation omitted). It ensures that state courts are given "a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." O'Sullivan, 526 U.S. at 845; Duncan v. Henry, 513 U.S. 364, 366 (1995).

After exhaustion, but before a federal court can issue a writ of *habeas corpus*, a petitioner then must overcome a "difficult to meet[] . . . and highly deferential standard for evaluating

13

state-court rulings, which demands that state-court decisions be given the benefit of the doubt."

Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1398 (2011) (citations and internal quotation

marks omitted). The statutory authority of federal courts to grant *habeas corpus* relief for

persons in state custody is provided by 28 U.S.C. § 2254. As amended by the Antiterrorism and

Effective Death Penalty Act ("AEDPA"), § 2254 limits the grounds on which a federal court

may grant a *habeas* petition. If an application includes a claim that has been adjudicated on the

merits in state court proceedings – that is, the petitioner has met the exhaustion requirement –

that application:

> shall not be granted with respect to any claim . . . unless the
> adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" clearly established federal law "if the state court 'applie[d] a

rule that contradicts' that precedent, or reached a different result than the Supreme Court on facts

that are 'materially indistinguishable.'" Mannix v. Phillips, 619 F.3d 187, 195 (2d Cir. 2010)

(internal alterations omitted) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). As long

as the state court decision applied the correct legal rule to the facts of a petitioner's case, it is not

subject to *habeas* review, even if the federal court would have reached a different conclusion if it

were to apply the rule itself. Williams, 529 U.S. at 406.

14

A state court decision involves an "unreasonable application" of clearly established federal law if the court identified the legal rule set forth in governing Supreme Court cases, but unreasonably applied the rule to the facts of the case. Id. at 407. The state court decision, as it pertains to any issue of federal law, must have been "objectively unreasonable" in light of relevant precedent; thus, in construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive *habeas* review. Williams, 529 U.S. at 409-11; see also Besser v. Walsh, 601 F.3d 163, 178 (2d Cir. 2010) ("The proper inquiry is not whether a state court's application of, or refusal to extend, the governing law was erroneous, but whether it was 'objectively unreasonable.'" (quoting Williams, 529 U.S. at 409-10)). The standard is "highly deferential." Woodford v. Visciotti, 537 U.S. 19, 24 (2002). This deference is required even when the state court renders a decision without an explanation. Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 784 (2011). Factual determinations made by a state court are presumed correct, and a petitioner bears the burden of rebutting this "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Federal courts are required to construe *pro se* litigants' *habeas* petitions liberally. See Roldan v. Racette, 984 F.2d 85, 87 (2d Cir. 1993); see also Haines v. Kerner, 404 U.S. 519, 520–21 (1972).

### III.   Admission of Lineup Identification

Stanley first argues that his lineup identification was (1) the fruit of an unlawful arrest and (2) unduly suggestive.

#### A.  Exhaustion

As a threshold matter, Stanley exhausted his lineup identification claims. He raised them in constitutional terms in his Appellate Division brief, and sought leave to appeal from the

15

decision of the Appellate Division affirming the conviction to the Court of Appeals. Respondent

does not contest this exhaustion.

### B.  Lineup Identification as Fruit of Unlawful Arrest

Stanley argues that his lineup identification should have been suppressed as the fruit of an

unlawful arrest. Because Stanley was provided with a "full and fair" opportunity to litigate this

issue at his pretrial suppression hearing and through appellate review, however, the Court may

not hear his claim.

In Stone v. Powell, 428 U.S. 465 (1976), the Supreme Court curtailed federal *habeas*

review of Fourth Amendment claims when the state provided "an opportunity for full and fair

litigation" of the challenge. Id. at 482. Accordingly, the Court of Appeals for the Second Circuit

has held that federal review of Fourth Amendment *habeas* claims should occur only if: (1) the

state provided no corrective procedures at all to redress the alleged Fourth Amendment violation;

or (2) the state provided a corrective mechanism, but the defendant was precluded from using

that mechanism because of an unconscionable breakdown in the underlying process. Gates v.

Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (*en banc*); Capellan v. Riley, 975 F.2d 67, 70 (2d

Cir. 1992) (citations omitted).

Here, Stanley had a Dunaway and Wade hearing where his lawyer challenged his lineup

identification. See Dunaway v. New York, 442 U.S. 200 (1979); United States v. Wade, 388 U.S.

218 (1967). Stanley's counsel actively participated in the hearing, and Justice Yates carefully

considered Stanley's arguments before making his ruling, finding that "the combination of

factors . . . gave the police reasonable suspicion justifying the pursuit." (H. at 461.)

Stanley's hearing then was reviewed by the Appellate Division, which determined that

the police had a "reasonable suspicion of criminality" and reiterated the hearing court's

assessment that: (1) the police were "justified [in] their pursuit of [Stanley] and his companions"; (2) the police had probable cause to arrest Stanley after "[i]t appeared that a codefendant discarded a pistol during the pursuit" and the police recovered that pistol; and, moreover, (3) "because of intervening events, the lineup identification was attenuated from any initial illegality." Stanley, 925 N.Y.S.2d 507.

Through these proceedings, the state provided Stanley with a legally sufficient "full and fair opportunity" to litigate his claim at the trial level and on direct appeal. See Singh v. Miller, 104 F. App'x 770, 772 (2d Cir. 2004) (finding petitioner had "ample opportunity to vindicate his Fourth Amendment rights in the state courts" when, inter alia, he "raised his Fourth Amendment argument on appeal"); Graham v. Costello, 299 F.3d 129, 134 (2d Cir. 2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the [state] court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief."); Chavis v. Henderson, 638 F.2d 534, 538 (2d Cir. 1980) (Petitioner's claim "that his arrest was without probable cause and that therefore the identification evidence should have been excluded, was properly rejected by the district court. [Petitioner] made no showing . . . that he had been precluded from a full and fair opportunity to litigate this issue in the state courts. Under Stone v. Powell . . . , he may not urge the same grounds for federal habeas corpus relief."); Arias v. Sabourin, 01 Civ. 09986 (GBD)(KNF), 2006 WL 236584, at *1 (S.D.N.Y. Jan 28, 2006) (finding "petitioner was afforded an opportunity for a full and fair litigation of his Fourth Amendment claims in a combined Dunway/Wade/Mapp hearing"); Skinner v. Duncan, 01 Civ. 06656 (DAB)(AJP), 2003 WL 21386032, at *13-16 (S.D.N.Y. June 17, 2003) (finding Dunaway/Wade/Mapp hearing provided petitioner with full

and fair opportunity to litigate Fourth Amendment claim in state court); cf. Jackson v. Scully,
781 F.2d 291, 297 (2d Cir. 1986) (finding that "New York clearly provided" petitioner with "an
opportunity fully and fairly to litigate" his Fourth Amendment claim even after state conceded
that petitioner's arrest lacked probable cause).[3]

     In his reply, Stanley argues that the procedural bar against bringing claims in federal
court that were not brought in state court should apply equally to the respondent as to a
petitioner. Because respondent never cited Stone in state court, Stanley suggests, he waived any
Stone defense in federal court. This argument is unpersuasive. The rule articulated in Stone
concerns a *federal court's* authority to review Fourth Amendment claims raised in state court. It
would make little sense for the respondent to present such an argument in *state court* before a
petitioner even invokes federal *habeas* jurisdiction. Stanley's citation to Boardman v. Estelle,
957 F.2d 1523, 1537 (9th Cir. 1992) (*per curiam* supplement to opinion), does not alter the
analysis. There, the respondent failed to raise a defense in the district court and again on appeal,
and upon the respondent's petition for rehearing the Court of Appeals for the Ninth Circuit
accordingly chose "not [to] save the state from such a gaffe." Id. But here there is no similar
"gaffe": respondent properly raised Stone at the first instance when it could properly apply.

     Stanley makes other challenges to the merit of the state court's decision and the reliability
of the evidence, arguing that the lineup identification should have been excluded. But on *habeas*
review, the Court is constrained to examine whether a petitioner was provided with a full and fair
chance to present his Fourth Amendment claim. Because the state provided Stanley with that

---

[3] The state procedure provided to litigate Fourth Amendment claims, C.P.L. § 710, has been expressly
approved of by the Court of Appeals for the Second Circuit. See Capellan, 975 F.2d at 70 n.1 ("[F]ederal
courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in
[C.P.L. § 710], as being facially adequate."); Jackson, 781 F.2d at 297 ("New York clearly provided
[petitioner] with such an opportunity [to fully and fairly litigate his Fourth Amendment claim]" pursuant
to § 710 (citations omitted)).

opportunity, and no evidence before the Court demonstrates that Stanley was precluded from

using the corrective mechanism through an "unconscionable breakdown" in the applicable state

procedure, there is no basis for federal *habeas* review of this claim.

### C.  Lineup Identification as Unduly Suggestive

Stanley also argues that his lineup identification was unduly suggestive because he was

over a decade younger than four of the five fillers and his dark skin color contrasted four of the

five fillers who were significantly lighter-skinned. The Court cannot grant Stanley *habeas* relief

on this ground, however, because Stanley's claim is partially procedural barred, lacks legal merit

and, in the alternative, falls within the Supreme Court's definition of harmless legal error.

### 1.  Procedural Default

As a threshold matter, Stanley's skin color claim is procedurally defaulted because he did

not raise it during his suppression hearing. A state court decision will not be reviewed if it "rests

on a state law ground that is independent of the federal question and adequate to support the

judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991); Bierenbaum v. Graham, 607 F.3d

36, 47 (2d Cir. 2010). "The rule applies with equal force whether the state-law ground is

substantive or procedural." Lee v. Kemna, 534 U.S. 362, 375 (2002); see also Glenn v.

Bartlett, 98 F.3d 721, 724 (2d Cir. 1996) (finding that state court's reliance on a procedural

ground as one basis for the denial of the claim precludes *habeas* review even if it also considered

the merits of the claim). A "state law ground is only adequate to support the judgment and

foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state,

and application of the rule would not be 'exorbitant.'" Bierenbaum, 607 F.3d at 47 (quoting the

Court of Appeals quoting Lee, 534 U.S. at 376). Three factors (the "Lee factors") are useful in

deciding whether the application of the rule would be exorbitant:

19

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Garvey v. Duncan, 485 F.3d 709, 714 (2d Cir. 2007) (citation omitted); see Lee, 534 U.S. at 381-85.

Although not directly cited by the Appellate Division, "New York's preservation rule, codified at [N.Y. Crim. Proc. Law ("C.P.L.")] § 470.05(2), require[s], at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." Richardson v. Greene, 497 F.3d 212, 218 (2d Cir. 2007) (citations and internal quotation marks omitted); see People v. Beasley, 921 N.Y.S.2d 178, 180 (N.Y. 2011). The "defendant must specifically focus on the alleged error." Garvey, 485 F.3d at 714 (citing New York cases). This rule is firmly established and regularly followed. Id. at 718 ("[Section] 470.05(2) is a firmly established and regularly followed New York procedural rule.").[4]

Here, Stanley argued at his suppression hearing that his lineup was unduly suggestive because of the filler's ages, but he never raised the issue of skin color. Because of this omission, the Appellate Division held that Stanley "did not preserve his contention that the lineup was

---

[4] In his reply, Stanley argues that § 470.05(2) is not firmly established because the Appellate Division "routinely" applies its discretion to excuse a procedural default in the interest of justice. (Stanley Reply to Respondent's Opposition to Habeas Corpus Petition ("Pet. Reply") at 16.) But this general objection does not counter the Court of Appeals' holding that § 470.05(2) is firmly established and regularly followed. Indeed, "regularly followed" does not mean "never deviated from." See Beard v. Kindler, 558 U.S. 53, 60 (2009) ("We hold that a discretionary state procedural rule can serve as an adequate ground to bar federal habeas review.").

unduly suggestive because of a disparity in skin complexion between himself and the fillers."

Stanley, 925 N.Y.S.2d 507. The Appellate Division, therefore, relied on a firmly established

procedural rule. Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) ("[F]ederal *habeas* review

[was] foreclosed [because the] state court [] expressly relied on a procedural default as an

independent and adequate state ground . . . ."); Sheard v. Conway, 09 Civ. 03603 (SLT)(LB),

2012 WL 5603343, at *1 (E.D.N.Y. Nov. 15, 2012) (finding that "[a]s Petitioner did not move to

reopen his Wade hearing" the reviewing magistrate judge "properly found that the issue was not

preserved for appellate review and that the Appellate Division's decision was based on an

independent and adequate state law ground"); see also People v. Alexander, 706 N.Y.S.2d 311

(1st Dep't 2000) (mem.) ("Defendant's contention that the photographic array was unduly

suggestive because the other five men appeared to be darker-skinned than defendant is not

preserved for appellate review since defendant failed to raise the issue during the Wade hearing."

(citation omitted)).

   Turning to the Lee factors, it is not exorbitant to apply § 470.05(2) to bar *habeas* review

of Stanley's claim. First, "[h]ad [Stanley] complied with § 470.05(2), the trial court would have

had the opportunity to consider whether the" lineup should have been suppressed because of

differences in skin color. Garvey, 485 F.3d at 719. Second, "[t]here was no sudden or

unanticipated event that led [Stanley] not to comply with § 470.05(2)." Id. Third, and most

importantly, Stanley "violated the very substance of the rule . . . . that the trial court must be

given a fair opportunity to rule on an issue of law before it can be raised on appeal." Id. at 720.

Therefore, the applicable considerations "do[] not indicate that this application of § 470.05(2)

was exorbitant." Id. at 719.

In his reply, Stanley challenges the second factor, arguing that the Appellate Division's decision to forgive a procedural default in the interest of justice means that compliance with the rule was not demanded. But the existence of this Appellate Division safeguard does not render optional compliance with the rule. See Garvey, 485 F.3d at 718 ("[Section] 470.05(2) is a firmly established and regularly followed New York procedural rule."); see also Beard, 558 U.S. at 60. Stanley also challenges the third factor, arguing that his counsel failed to adhere to (uncited) American Bar Association standards of effectiveness. But the focus of this factor is limited to whether a state court had opportunity to address the issue – it did not – and not whether counsel was effective in failing to raise it. Accordingly, this argument too is unavailing.

The Supreme Court, however, has carved out two exceptions to the bar against reviewing procedurally defaulted *habeas* claims. "Where a petitioner has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in *habeas* only if the petitioner can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" DiSimone v. Phillips, 461 F.3d 181, 190 (2d Cir. 2006) (brackets omitted) (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)). To establish cause for default, the petitioner must adduce "some objective factor, external to [p]etitioner's defense," or futility because "prior state case law has consistently rejected a particular constitutional claim . . . . But futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." Gutierrez v. Smith, 702 F.3d 103, 111-12 (2d Cir. 2012) (internal quotation marks and citations omitted). Prejudice requires establishing "'actual prejudice' resulting from the errors of which [petitioner] complains." United States v. Frady, 456 U.S. 152, 168 (1982). This must result in "substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions." Murray v. Carrier, 477 U.S. 478, 494 (1986).

22

Here, Stanley offers no legitimate reason for his failure to raise his claim and cites cases showing that claims of undue suggestiveness are not consistently rejected under New York law. In his reply, Stanley argues that cause is established through his counsel's failure to raise the issue of lineup suggestiveness based on skin color. But this alleged failure by Stanley's attorney is not an objective factor external to his defense. Gutierrez , 702 F.3d at 111-12; see Coleman, 501 U.S. at 753 ("Attorney ignorance or inadvertence is not 'cause' because the attorney is petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error" (citation and internal quotation marks omitted)).[5]

Accordingly, Stanley cannot establish cause for his default and, therefore, the first exception cannot excuse his procedural default. See Gutierrez, 702 F.3d at 111 (petitioner must demonstrate both "cause and actual prejudice" (citation and internal quotation marks omitted)); Farr v. Greiner, 01 Civ. 06921 (NG)(MDG), 2007 WL 1094160, at *18 (E.D.N.Y. Apr. 10, 2007) (collecting cases finding that when a petitioner cannot show cause for procedural default, a court does not need to reach question of whether petitioner can show prejudice).

Nonetheless, Stanley also cannot establish prejudice. He argues that the lineup identification was crucial to the prosecution's case because McCoy was the only witness to identify him and the remaining circumstantial evidence was insufficiently persuasive. But if the

---

[5] Stanley uses words to suggest that his counsel was ineffective under the Sixth Amendment because of his failure to object to the lineup on skin color grounds. But Stanley has made no showing that his counsel's performance was objectively unreasonable, as required to sustain such a claim. See Strickland v. Washington, 466 U.S. 668 (1984) (finding that an ineffective assistance claim requires showing counsel's performance was objectively unreasonable and the client suffered prejudice); see also Harrington, 131 S. Ct. at 788 (applying Strickland's deferential standard to counsel's performance in a *habeas* petition and finding that "[t]he standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so" (internal quotation marks and citations omitted)). Indeed, a "strong presumption" exists that counsel's attention to certain issues to the exclusion of others reflects trial tactics and not "sheer neglect." Yarborough v. Gentry, 540 U.S. 1, 8 (2003).

underlying claim could not prevail, denying an opportunity to raise that claim is not fundamentally unfair. See Ramos v. Racette, 11 Civ. 01412(JG), 2012 WL 12924, at *16 (E.D.N.Y. Jan. 4, 2012) ("Because [petitioner]'s . . . claim fails on the merits, he cannot show prejudice from his procedural default in state court, and thus he is procedurally barred from raising this claim in a federal *habeas* petition as well."); James v. Smith, 06 Civ. 06441 (JG), 2008 WL 755601, at *5 (E.D.N.Y. Mar. 20, 2008) (finding cause for default and prejudice could not be shown when petitioner's claim failed on the merits). And as discussed *infra*, Stanley's claim fails on the merits.

In the alternative, Stanley also has not established a fundamental miscarriage of justice, "such as a proffer of evidence that he was actually innocent of the crime." Arroyo v. Lee, 831 F. Supp. 2d 750, 763 (S.D.N.Y. 2011) (citing Schlup v. Delo, 513 U.S. 298, 324 (1995)). In his reply, Stanley does argue that he was actually innocent. But as discussed *infra*, there was sufficient evidence for a jury to convict Stanley, even absent the allegedly tainted identification. Stanley presents no additional evidence to support his claim. See Schlup, 513 U.S. at 316 ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a *habeas* court to reach the merits of a barred claim."). He points to a study reporting that "four out of five police agencies in the United States[] have no written policies for handling eyewitness identification" but does not connect that study to the police department or identification in this case. (Pet. Reply at 18.) Stanley's claim that his lineup was unduly suggestive because of differences in skin color, therefore, is barred from review.

24

## 2.   Merits of Lineup Identification Claims

Turning to the merits, Stanley argues that his identification was unduly suggestive because he was placed with fillers who were older and darker skinned.[6] The Supreme Court has established a two-part test for evaluating whether the admission of an out-of-court identification comports with due process. The Court first must determine whether the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968); see also Manson v. Brathwaite, 432 U.S. 98, 105-14 (1977); Neil v. Biggers, 409 U.S. 188, 196-97 (1972). If the procedure was not unduly suggestive, then the identification evidence presents no due process obstacle to admissibility, and no further inquiry is required. Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001) (citations omitted). But even if the procedure is found to be impermissibly suggestive, the identification still may be admitted at trial if the "totality of the circumstances" shows that the identification was independently reliable. See Manson, 432 U.S. at 113-14. Whether or not the identification was independently reliable turns on "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neil, 409 U.S. at 199-200. For the following reasons, Stanley cannot establish that his lineup identification was unduly suggestive either because of skin tone or because of age.

Turning to the first argument, Stanley claims that his lineup was unduly suggestive because his skin was darker than most of the fillers. Stanley explains that "dark skin color was

---

[6] The Court will consider the merits of Stanley's procedurally defaulted skin color claim because it is meritless. See Wright v. Duncan, 500 F. App'x 36, 38 (2d Cir. 2012) (denying habeas petition as procedurally defaulted and otherwise meritless).

the only physical description of the perpetrator subsequently identified as [him]," (Kenneth

Stanley's Petition Under 28 U.S.C. § 2254 For Writ of *Habeas Corpus* by a Person in State

Custody ("Pet.") at 28), yet "the lineup photograph reveals that only one other person in the

lineup had similar dark skin . . . . [and] [f]our out of the five fillers appear[ed] to be significantly

lighter skinned than [he]," (Id. at 28-29). Moreover, that "filler [with] similar dark skin was

thirteen years older." (Id. at 29.)

The Appellate Division concluded that the lineup was not impermissibly suggestive. It

found that "defendant's skin tone was reasonably similar to that of most of the fillers, and that

[Stanley] did not stand out from the others." Stanley, 925 N.Y.S.2d 507. That factual finding is

presumptively correct for the purpose of this proceeding. 28 U.S.C. § 2254(e)(1); Carroll v.

Greene, 04 Civ. 04342 (RWS), 2006 WL 2338119, at *11 (S.D.N.Y. Aug. 11, 2006) (finding

presumptively correct the finding that one of the fillers "was not much lighter than [petitioner] in

skin color" and lineup was not "unduly suggestive"). Stanley has not adduced clear and

convincing evidence to rebut this presumption. Indeed, he has not even provided his lineup

photograph for the Court's review.

Moreover, "[s]kin tone is only one of the factors to be considered in deciding 'reasonable

similarity' . . . and differences in skin tone alone will not render a lineup unduly suggestive."

People v. Pointer, 677 N.Y.S.2d 582 (2d Dep't 1998) (citations omitted); see, e.g., Roldan v.

Artuz, 78 F. Supp. 2d 260, 273 (S.D.N.Y. 2000) (finding "[d]ifferential in skin color between

lineup participants does not violate due process"); Agosto v. Kelly, 88 Civ. 01336, 1989 WL

79484 at *3 (E.D.N.Y. July 10, 1989) ("Slight variations in complexion tone, to the extent they

existed, did not create an unconstitutionally suggestive pre-trial identification." (citation

omitted)); People v. Stephens, 679 N.Y.S.2d 109 (1st Dep't 1998) ("The variation in skin tone among the various members of the lineup was not significant . . . .").

Turning to the second argument, Stanley claims that his lineup was unduly suggestive because he "was only 24 years old on the date of the lineup . . . . [y]et, four out of the five fillers were more than a decade older than [he]" – two were 14 years older, two were 13 years older, and one was 7 years older. (Pet. at 28.)

The judge presiding over the suppression hearing, however, found that the lineup photograph confirmed that Stanley was surrounded by fillers sufficiently similar to him and the lineup was not "unnecessarily or unduly suggestive." (H. at 457-58.) The Appellate Division upheld that finding after also reviewing the lineup photograph. Stanley, 925 N.Y.S.2d 507. This factual finding too is presumptively correct for the purpose of this proceeding. 28 U.S.C. § 2254(e)(1). Stanley has not rebutted this presumption by clear and convincing evidence.

Moreover, the fact that "all of the lineup fillers were older . . . is not enough to constitute an unduly suggestive lineup." Roldan, 78 F. Supp. 2d at 270 (citations omitted); see, e.g., Castaneda v. Artuz, 97 Civ. 02262 (RR), 1998 WL 938860 at *6 (E.D.N.Y. Nov. 18, 1998). Age differences do not pose a substantial risk of misidentification if they are not readily apparent. See Hartley v. Senkowski, 90 Civ. 00395, 1992 WL 58766 at *3-4 (E.D.N.Y. Mar. 18, 1992) (defendant's challenge to lineup on ground that fillers "appeared to be several years older" rejected where "all participants appear[ed] to be of approximately the same age, height, weight and coloring"); People v. Poey,  689 N.Y.S.2d 509, 509 (2d Dep't 1999) ("Despite certain age and weight disparities, the fillers were sufficiently similar to the defendant in appearance so that he was not singled out for identification." (citations omitted)).

27

Here, there is no evidence that the differences in age or skin color were readily apparent beyond Stanley's unsupported statement. Furthermore, "[t]here [generally] is no requirement that a suspect in a lineup be surrounded by people identical in appearance." Roldan, 78 F. Supp. 2d at 270 (collecting cases). When a lineup contains participants having varied appearances, "the 'principal question' in determining suggestiveness is whether the appearance 'of the accused, matching descriptions given by the witness,' so stood out from" the other participants as to suggest to the witness that the suspect was the culprit. United States v. Wong, 40 F.3d 1347, 1359-60 (2d Cir. 1994) (emphasis in original) (quoting Jarrett v. Headley, 802 F.2d 34, 41 (2d Cir. 1986)).

Here, Stanley and the five fillers were seated to minimize any potential differences in height. The detectives who arranged the lineup provided Stanley and the fillers with identical grey shirts and white caps to minimize variations in clothing or hairstyle. See Hartley, 1992 WL 58766, at *3-4 (rejecting defendant's challenge to lineup on ground that fillers "appeared to be several years older" because "all participants appear[ed] to be of approximately the same age, height, weight and coloring"); cf. Israel v. Odom, 521 F.2d 1370, 1374 (7th Cir. 1975) ("Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification." (citations omitted)). Stanley also selected his position in the lineup where McCoy identified him, minimizing any danger that the police might choose to place him in a particular order to suggest a particular result. It is not insignificant, moreover, that Stanley's counsel at the time was present at the lineup and did not object to its composition.

In his reply, Stanley presents the same arguments for why his lineup was unduly suggestive. As shown, they must be rejected. He also argues that the lineup was not independently reliable. But if "the procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility; no further inquiry by the Court is required, and the reliability of properly admitted eyewitness identification, like the credibility of other parts of the prosecution's case is a matter for the jury. Raheem, 257 F.3d at 133 (internal quotation marks, brackets and citations omitted).

Even so, the totality of the circumstances establishes that Stanley's identification was independently reliable. See United States v. Bautista, 23 F.3d 726, 729 (2d Cir. 1994) (exclusion of identification evidence is warranted "only if it was both produced through an unnecessarily suggestive procedure and unreliable (emphasis in original)). Here, although Stanley's lineup was four days after the crime, McCoy clearly identified Stanley. McCoy had ample opportunity to observe Stanley when he entered the parking lot and then when he took McCoy's wristwatch. In his reply, Stanley objects that when the crime occurred McCoy had only limited time to view Stanley, but cites to a case where the identification was much less reliable. Dickerson v. Fogg, 692 F.2d 238, 245 (2d Cir. 1982) (finding that identification was unreliable when witness claimed to accurately identified a vehicle's back seat passenger, from down the street at night, who was wearing a hat pulled over his head). McCoy, in contrast, was close to and looking directly at Stanley. Moreover, McCoy's description was consistent with other witnesses' descriptions, and with what Stanley was wearing when arrested. It is insufficient for Stanley now to state that McCoy lacked credibility.

Because the Appellate Division reasonably determined that Stanley's lineup was not unduly suggestive – and, furthermore, the totality of circumstances established the independent

reliability of the identification – Stanley's lineup claims, if not procedurally barred, should be rejected on the merits.

### 3. Harmless Error

Finally, even if the Court were to conclude that the lineup was unduly suggestive, any constitutional error was harmless. On federal *habeas* review, the standard for harmless error is that a petitioner must show that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993) (citation omitted); accord Fry v. Pliler, 551 U.S. 112, 116, 121-22 (2007) (clarifying that Brecht standard applies when reviewing a state court judgment under 28 U.S.C. § 2254(d)); Wood v. Ercole, 644 F.3d 83, 93-94 (2d Cir. 2011). Stanley has not met this standard.[7]

Stanley argues that the lineup identification was crucial to the prosecution's case because McCoy was the only witness to identify him and the remaining circumstantial evidence was insufficiently persuasive. Respondent argues that even absent the lineup identification, the evidence was sufficient to establish Stanley's guilt such that he cannot show that it had substantial and injurious effect in influencing the jury's verdict.

The Court agrees with the respondent; even absent the lineup and in-court identification, the prosecution introduced sufficient evidence to establish that Stanley committed the crime for which he was convicted. To begin with, officers observed Stanley, Jones and Stewart running down Fifth Avenue between 22nd and 21st Streets shortly after McCoy and Bailey saw the men who robbed them run east on 22nd Street toward Fifth Avenue. Stanley was found running on a path consistent with the robbers' flight, with two other individuals, immediately after the robbery. One of the officers chasing the three men also saw Jones fumbling with his waistband at

---

[7] Stanley argues that the admission of the lineup identification "was not harmless beyond a reasonable doubt." (Pet. at 30.) But this is not the correct standard on federal *habeas* review.

the corner of 19th Street and Broadway. The police then stopped the three men near that corner, and found a silver handgun where Jones was observed fumbling with his waistband. That firearm, which had Stanley's DNA on it, matched the description of the robbery weapon.

Relatedly, both McCoy and Bailey separately viewed Jones in a lineup, and identified him as the man holding the gun in the parking lot. It is likely that Stanley, who was found running with Jones and Stewart, also was one of the two men with Jones in the parking lot right before. Stanley, Jones and Stewart also consistently matched witnesses' descriptions of the robbers. Finally, a spent shell casing was found in the prisoner van that transported Stanley, by an officer who examined the van before it was used to transport any other individuals. Ballistics testing confirmed that the shell had been fired from the robbery weapon.

In light of this evidence, Stanley cannot establish that the inclusion of the lineup identification "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637-38.

IV.     **Excessive Sentencing**

Finally, Stanley argues that his sentence of 17 years, to be followed by five years of post-release supervision, is excessive and should be reduced. This argument is precluded on exhaustion grounds and unavailing on the merits.

A.  **Exhaustion of Stanley's Excessive Sentencing Claim**

Respondent argues, and Stanley does not dispute, that he did not exhaust his excessive sentencing claim by raising it in federal constitutional terms to the highest state court. Although New York's Appellate Division has discretion to reduce a sentence in the interest of justice, see C.P.L. §§ 470.15(3), (6)(b), a federal court considering a state court *habeas* petition has no such power; indeed, "a claim that a sentence should be reduced in the interest of justice does not

31

allege a violation of a federally protected right." Paul v. Ercole, 07 Civ. 94262 (CM)(HBP), 2010 WL 2899645, at *5 (S.D.N.Y. June 10, 2010) (collecting cases), adopted by 2010 WL 2884720 (S.D.N.Y. July 21, 2010); see Fielding v. LeFevre, 548 F.2d 1102, 1109 (2d Cir. 1977) (finding petitioner raised no cognizable federal claim by seeking to prove that state judge abused his sentencing discretion by disregarding psychiatric reports) (citing Townsend v. Burke, 334 U.S. 736, 741 (1948) ("The [petitioner's] sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of *habeas corpus*.")).

In his Appellate brief, Stanley relied on the Appellate Division's discretionary authority to reduce his sentence in the "interest of justice." Then, and here, Stanley argues that his sentence should be reduced because he had an unstable home life, was offered a lesser 12-year prison term before trial, and has served only three years in prison for his prior claims. Stanley never alleged, and does not now allege, a violation of a federal protected right. Therefore, the Court cannot review his claim.

**B. Merits of Stanley's Excessive Sentencing Claim**

Stanley's claim fails on the merits even if it is read to assert that his sentence is so disproportionately long that it is cruel and unusual and thus a violation of the Eighth Amendment. See Herrera v. Artuz, 171 F. Supp. 2d 146, 151 & n.2 (S.D.N.Y. 2001) (construing excessive sentence claim of *pro se habeas* petitioner to assert Eighth Amendment violation). A sentence violates the Eighth Amendment when it is "grossly disproportionate" to the crime committed or when the sentence imposed "shocks the collective conscience of society." United States v. Gonzalez, 922 F.2d 1044, 1053 (2d Cir. 1991); see Kennedy v. Louisiana, 554 U.S. 407, 420-21 (2008); Atkins v. Virginia, 536 U.S. 304, 311 (2002). But a sentence within the

range established by state law ordinarily is not subject to an Eighth Amendment challenge.

White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is

presented where . . . the sentence is within the range prescribed by state law." (citation omitted));

Paul, 2010 WL 2899645, at *6 (collecting cases).

 Here, the trial judge imposed a sentence of 17 years, which is in the middle of the range

for Robbery in the First Degree, the top count in the indictment. See Penal Law § 70.04(3)(a)

(providing for maximum sentence of 25 years in prison). Sentences of equal or longer duration in

similar situations routinely have been upheld against Eighth Amendment challenges. See Folk v.

Philips, 05 Civ. 00557 (NGG), 2007 WL 4264577, at *7 (S.D.N.Y. Nov. 30, 2007) (finding

sentence of 25 years to life for persistent violent felony offender convicted of Robbery in the

First Degree did not violate Eighth Amendment); Serrano v. Greiner, 00 Civ. 09103 (HB), 2002

WL 1997896, at *2 (S.D.N.Y. Aug. 29, 2002) (finding sentence of 20 years to life for persistent

violate felony offender convicted of Robbery in the First Degree did not violate Eighth

Amendment); Frazier v. New York, 187 F. Supp. 2d 102, 116-17 (S.D.N.Y. 2002) (finding 20

year sentence for Robbery in the First Degree, when defendant was a second felony offender, did

not violate Eighth Amendment); see also United States v. Reid, 300 F. App'x 50, 53 (2d Cir.

2008) (finding sentence of 107 years did not violate petitioner's rights under Eighth Amendment

in view of petitioner's ten prior convictions, and fact that the instant armed robberies were

committed while on probation for armed robbery).

 Stanley's sentence, in the middle of a range enacted by a representative body, is not

grossly disproportionate and does not shock the conscience: therefore, it is not unconstitutional.

See also Ewing v. California, 538 U.S. 11, 21 (2003) ("Outside the context of capital

punishment, successful challenges to the proportionality of particular sentences have been

exceedingly rare." (citation omitted)). Stanley is not entitled to *habeas* relief based on his sentence's length.

## CONCLUSION

For these reasons, I recommend that Stanley's petition for a writ of *habeas corpus* be DENIED as to all claims. Because Stanley has not made a substantial showing of the denial of a constitutional right, I recommend that no certificate of appealability be issued. See 28 U.S.C. § 2253(c)(2); Lucidore v. N.Y.S. Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000).

I further recommend that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith and, therefore, that *in forma pauperis* status be denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

\*       \*       \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres at the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

Any requests for an extension of time for filing objections must be addressed to Judge Torres. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge


DATED:      New York, New York
            August 9, 2013

35